IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

JOAQUIN HERRERA AVILA,

*Petitioner-Appellee*,

v.

PAMELA BONDI, ATTORNEY GENERAL, et al.,

*Respondents-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA
No. 25-cv-3741 (Tunheim, J.)

_____

BRIEF FOR *AMICI CURIAE* IMMIGRATION LAW SCHOLARS
IN SUPPORT OF PETITIONER-APPELLEE
SUPPORTING AFFIRMANCE

_____

Amit Jain
Kathleen Pleiss
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3434
amit.jain@macarthurjustice.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION ............................................................................ 3

ARGUMENT ................................................................................ 6

I.    IIRIRA Retained § 1225(b)(2)(A)'s Longstanding Focus on the Border and § 1226(a)'s Broad Application to the Interior. ........................................ 6

II.   Respondents' Simplistic Account of IIRIRA's Purpose Conflicts with the Enacted Text and the Full Legislative Record. ....................................... 14

III.  Three Decades of Executive Practice and Legislative Amendments Confirm Petitioner's Interpretation. ............................................................ 24

CONCLUSION ............................................................................. 29

Appellate Case: 25-3248    Page: 2    Date Filed: 01/26/2026   Entry ID: 5600860

# TABLE OF AUTHORITIES

**Cases**                                **Page(s)**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025).................................................................13

*Biden v. Texas*,
597 U.S. 785 (2022).........................................................4, 8, 24

*Castañon-Nava v. U.S. Dep't of Homeland Sec.*,
161 F.4th 1048 (7th Cir. 2025) ...........................................3

*Castle Rock v. Gonzales*,
545 U.S. 748 (2005).................................................................18

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)...........................................................10, 12

*Department of Homeland Security v. Thuraissigiam*,
591 U.S. 103 (2020).................................................................14

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005).................................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).............................................................24, 27

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)...................................................................4

*INS v. St. Cyr*,
533 U.S. 289 (2001).................................................................16

*Jennings v. Rodriguez*,
583 U.S. 281 (2018).................................................................28

*Landon v. Plasencia*,
459 U.S. 21 (1982)...................................................................22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).............................................................25, 26

Appellate Case: 25-3248    Page: 3    Date Filed: 01/26/2026 Entry ID: 5600860

*Martin v. United States*,
605 U.S. 395 (2025)..................................................................19

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994)....................................................................6

*Mellouli v. Lynch*,
575 U.S. 798 (2015)..................................................................24

*Monsalvo v. Bondi*,
604 U.S. 712 (2025)..................................................................26

*Nielsen v. Preap*,
586 U.S. 392 (2019)..................................................................28

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)....................................................................4

*Patel v. Garland*,
596 U.S. 328 (2022)..................................................................12

*Reno v. AADC*,
525 U.S. 471 (1999)..................................................................18

*Rodriguez v. United States*,
480 U.S. 522 (1987)..................................................................19

*Saxbe v. Bustos*,
419 U.S. 65 (1974)....................................................................26

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953)..................................................................14

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)....................................................................28

*United States v. Fausto*,
484 U.S. 439 (1988)..................................................................27

*United States v. Texas*,
599 U.S. 670 (2023)..................................................................18

Appellate Case: 25-3248    Page: 4    Date Filed: 01/26/2026 Entry ID: 5600860

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)......................................................................26

*West Virginia v. Env't Prot. Agency*,
   597 U.S. 697 (2022)..............................................................10, 11

*Whitman v. Am. Trucking Assocs., Inc.*,
   531 U.S. 457 (2001)..............................................................10, 12

*Yamataya v. Fisher*,
   189 U.S. 86 (1903)...............................................................13, 14

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)....................................................................13

**Statutes**

8 U.S.C. § 1101(a)(13)(A) ............................................................11, 22

8 U.S.C. § 1101(a)(43) ......................................................................16

8 U.S.C. § 1182(a)(9)(B) .............................................................20, 21

8 U.S.C. § 1182(d)(5)(A) ...................................................................28

8 U.S.C. § 1182(d)(5)(C) ...................................................................28

8 U.S.C. § 1225(a)(1) .........................................................................22

8 U.S.C. § 1225(b)(1) .........................................................................20

8 U.S.C. § 1225(b)(2)(A) ............................................................*passim*

8 U.S.C. § 1225(b)(2)(C) .............................................................20, 24

8 U.S.C. § 1226(a) ......................................................................*passim*

8 U.S.C. § 1226(c) ..............................................................................16

8 U.S.C. § 1226(c)(1)(E) ...................................................................27

8 U.S.C. § 1231(a)(2) .........................................................................17

8 U.S.C. § 1252(a)(1) (1996) ....................................................9, 12, 13

iv

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343,
102 Stat. 4181 ...................................................................................10

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No.
104-132, § 440, 110 Stat. 1214...........................................................16

Antiterrorism and Effective Death Penalty Act of 1996, § 414, 110
Stat. 1271 ............................................................................................9

Chinese Exclusion Act of 1882, Pub. L. No. 47-126, 22 Stat. 58 ............7

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 .................26

Illegal Immigration Reform and Immigrant Responsibility Act of
1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 ("IIRIRA") ...................3

IIRIRA, Pub. L. No. 104-208, div. C, §§ 101-12 ...................................20

IIRIRA, Pub. L. No. 104-208, div. C, § 301(b)(1) ...............................20

IIRIRA, Pub. L. No. 104-208, div. C, § 302...........................................20

IIRIRA, Pub. L. No. 104-208, div. C, § 302(a) ......................................9

IIRIRA, Pub. L. No. 104-208, div. C, § 303(a) ....................................16

IIRIRA, Pub. L. No. 104-208, div. C, § 303(b)......................................17

IIRIRA, Pub. L. No. 104-208, div. C, § 304...........................................22

IIRIRA, Pub. L. No. 104-208, div. C, § 305...........................................17

IIRIRA, Pub. L. No. 104-208, div. C, § 321...........................................16

IIRIRA, Pub. L. No. 104-208, div. C, § 386(a) .....................................16

Immigration Act of 1891, Pub. L. No. 51-551, § 8, 26 Stat. 1084 ...........7

Immigration Act of 1893, 27 Stat. 569, 570 Section 5 ...............................8

Immigration Act of 1903, Pub. L. No. 57-162, 32 Stat. 1213 ...................8

Immigration and Nationality Act of 1952, § 235, 66 Stat. 199 .................9

Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025) ...................27, 28

Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997) ................................................................26

Page Act, Pub. L. No. 43-141, 18 Stat. 477 (1875) ....................................................7

REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 302..........................26

USA PATRIOT Act of 2001, Pub. L. No. 107-56, §§ 411-12, 115 Stat. 272 ........................................................................................................26

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, §235, 122 Stat. 5044 ....................................27

**Other Authorities**

8 C.F.R. § 1.2 ................................................................................................................25

Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 HARV. L. REV. 1186 (2025) ....................................................................7, 9

DANIEL WILSHER, IMMIGRATION DETENTION: LAW, HISTORY, POLITICS (2012)........................................................................................................................7, 8

Denise Gilman, *Immigration Detention Expansion by Stealth*, 26 NEV. L.J. 163 (2025) ..........................................................................................9

H.R. Rep. No. 104-469 (1996).............................................................................*passim*

H.R. Rep. No. 104-828 (1996) (Conf. Rep.) .........................................................12

H.R. Rep. No. 104-879 (1997)..................................................................................23

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997)........................................................................25

Kyle Cheney, *Hundreds of Judges Reject Trump's Mandatory Detention Policy, With No End in Sight*, POLITICO (Jan. 5, 2026) .......................3

Lamar Smith & Edward R. Grant, *Immigration Reform: Seeking the Right Reasons*, 28 ST. MARY'S L.J. 883 (1997)....................................................17

Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. (forthcoming 2026) ................................................................................................9

vi

*Management Practices of the INS: Hearing Before the Subcomm. on Imm. & Claims of the H. Comm. on the Judiciary*, 104th Cong. 11 (Feb. 8, 1995) ................................................................................19

Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issues*, 74 INTERPRETER RELEASES 209 (1997) ..............................16, 17

Margaret H. Taylor, *Demore v. Kim*, *in* Immigration Stories 350 (2005) ........................................................................................10

Mary Holper, *From Border-Based to Status-Based Mandatory Immigration Detention*, 53 FORDHAM URB. L.J. (forthcoming 2026) ................................................................8, 9, 10

Nadine K. Wettstein, *The 1996 Immigration Act: New Removal Proceedings, Cancellation of Removal, and Voluntary Departure*, 73 INTERPRETER RELEASES 1677 (1996) ............................................22

Paulina Arnold, *How Immigration Detention Became Exceptional*, 75 STANFORD L. REV. 261 (2023)...................................................7

Phil Torrey, *Rethinking Immigration's Mandatory Detention Regime*, 48 U. MICH. J. L. REFORM 879 (2015) .........................................8, 10

Reply Brief of Appellants, *Lopez-Campos v. Raycraft*, No. 25-1965 (6th Cir. Jan. 15, 2026) ............................................................18

Reply Brief of Cross-Appellants/Appellees, *Crane v. Johnson*, No. 14-10049 (5th Cir. Sept. 29, 2014) ...........................................25

Supplemental Brief of Petitioners, *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204)................................................25

Transcript of Oral Argument, *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204) (Nov. 30, 2016) .................................................25

Transcript of Oral Argument, *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204) (Oct. 3, 2017) ...................................................25

Appellate Case: 25-3248     Page: 8     Date Filed: 01/26/2026 Entry ID: 5600860

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are expert scholars in immigration law, particularly the historical development and modern-day operation of immigration detention. *Amici* have published extensive scholarship on these topics and litigated relevant issues.

*Amici* are:

- Paulina D. Arnold, Assistant Professor of Law at the University of Michigan Law School;

- Ahilan T. Arulanantham, Professor from Practice and Co-Director of the Center for Immigration Law and Policy at UCLA School of Law;

- Adam B. Cox, Robert A. Kindler Professor of Law at NYU;

- Alina Das, Professor of Law and James Weldon Johnson Professor at New York University School of Law;

- Ingrid Eagly, Professor of Law at UCLA School of Law;

- Denise L. Gilman, Clinical Professor at the University of Texas at Austin School of Law;

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party or counsel to any party, and no person other than *amici* or their counsel, contributed money intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief. *Amici*'s institutional affiliations are listed solely for purposes of identification and do not indicate institutional support for the positions articulated in this brief.

1

- Bill Ong Hing, Associate Dean for Faculty Scholarship, Professor, Founding Director of the Immigration and Deportation Defense Clinic, and Dean's Circle Scholar at the University of San Francisco School of Law;

- Mary Holper, Clinical Professor and Director of the Immigration Clinic at Boston College Law School;

- Hiroshi Motomura, Susan Westerberg Prager Distinguished Professor of Law and Co-Director of the Center for Immigration Law and Policy at UCLA School of Law;

- Lindsay Nash, Professor of Law and Co-Director of the Center for Immigration Innovation and the Kathryn O. Greenberg Immigration Justice Clinic at Cardozo School of Law;

- Juliet Stumpf, Edmund O. Belsheim Professor of Law at Lewis and Clark Law School;

- Margaret H. Taylor, Associate Dean for Academic Affairs and Professor of Law at Wake Forest University Law School; and

- Philip L. Torrey, Assistant Clinical Professor of Law and Director of the Crimmigration Clinic at Harvard Law School.

*Amici*'s collective expertise yields important insights regarding the statutory provisions at issue here.

Appellate Case: 25-3248     Page: 10     Date Filed: 01/26/2026 Entry ID: 5600860

## INTRODUCTION

In mid-2025, bureaucrats purportedly discovered a sweeping command to detain millions of immigrants in the interior of the country who initially entered without inspection, without regard to how long they have resided within the United States, and without the opportunity to seek release on bond. This would constitute the broadest detention-without-bond mandate in the history of the Republic. According to Respondents, Congress added this unfunded mandate to a border-focused statute as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 ("IIRIRA"), yet its existence eluded five presidential administrations, the courts, and Congress itself for three decades.

As of January 5, 2026, at least 300 district court judges had ruled that Respondents' unprecedented reading of the provision in question, 8 U.S.C. § 1225(b)(2)(A), was wrong.[2] Indeed, as Petitioner explains, the text and context of this border-focused provision refute Respondents' novel interpretation. *See* Answering Brief (hereinafter "AB") at 29-37; *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025).

---

[2] Kyle Cheney, *Hundreds of Judges Reject Trump's Mandatory Detention Policy, With No End in Sight*, POLITICO (Jan. 5, 2026), https://www.politico.com/news/2026/01/05/trump-administration-immigrants-mandatory-detention-00709494.

*Amici* write to emphasize that history debunks it, too. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 804 (2022) (relying on "[t]he historical context in which" a nearby subprovision "was adopted" to "confirm[] the plain import of its text"); *Niz-Chavez v. Garland*, 593 U.S. 155, 165 (2021) ("resolv[ing]" residual "doubt . . . about the meaning of . . . two specific statutes" with "a wider look at IIRIRA's statutory structure and history"). "If text and context supply two strikes against" the government's newfound assertion of power, "history offers a third." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024).

At least three aspects of the history are instructive. *First*, for over a century leading up to IIRIRA, federal immigration statutes distinguished between the government's authority to detain people at the border and its authority to detain those in the interior. And relevant here, § 1225(b)(2)(A) and its predecessors focused on detention of people seeking lawful entry at a territorial border.

Respondents claim that in 1996, Congress used redundant wording to explode the scope of this detention provision beyond the border. But IIRIRA did the opposite: It retained the provision's focus, limiting it to noncitizens "seeking admission" at the border and defining "admission" to constitute a "lawful entry." Moreover, IIRIRA also reworded the authority for detaining people already in the interior, *with* the possibility of bond, now codified at § 1226(a). Instead of covering noncitizens "pending a determination of deportability," IIRIRA amended § 1226(a) to cover

4

noncitizens "pending a decision on whether [they] will be removed." That change ensured that noncitizens in the interior who had entered without inspection—in technical immigration terms, who were subject to "inadmissibility" rather than "deportability" grounds—were covered under § 1226(a). Thus, by attempting to erase the longstanding distinction between people seeking admission at the border and those within the interior, Respondents doubly err. Their position not only reduces § 1225(b)(2)(A)'s historic and textual focus on the border to surplusage, but also renders meaningless IIRIRA's amendments to the interior detention authority in § 1226(a).

*Second*, Respondents emphasize statutory purpose. Relying on a two-sentence snippet of legislative history, they assert that Congress in IIRIRA worked to treat everyone who entered without inspection exactly the same in all respects. But the truth is more nuanced. Where Congress expanded detention authority in the interior, IIRIRA's enacted text reflects acute awareness of real-world constraints—Congress specifically authorized the Immigration and Naturalization Service ("INS") to delay implementation of expanded crime-based detention if capacity was insufficient (which it was). Yet Congress evinced no such concern regarding § 1225(b)(2)(A), which (under Respondents' reading) would have mandated the detention of an order of magnitude more people from the moment of its enactment. And while members of the enacting Congress were acutely concerned about border security, they

5

addressed those concerns in IIRIRA not by creating Respondents' unprecedented interior-detention mandate, but by overhauling removal grounds and procedures, boosting border security funding and infrastructure, and creating a new, strictly circumscribed "expedited removal" process.

*Third*, twenty-nine years of unbroken executive practice, including under the first Trump Administration, cast further doubt on the government's late-breaking about-face. That practice, consistent with the statutory text, has been to allow for the availability of bond and bond hearings for those who entered the United States before apprehension. Congress, too, has repeatedly amended the Immigration and Nationality Act ("INA") since IIRIRA but never questioned this consistent practice. Congress's most recent expansion of mandatory detention, which covers a subset of noncitizens who entered without inspection, still further illustrates that Respondents' position—under which § 1225(b)(2)(A) already mandated detention of virtually all those people and millions more—cannot be right.

History thus confirms what text and context make plain: The judgment should be affirmed.

## **ARGUMENT**

### I. **IIRIRA Retained § 1225(b)(2)(A)'s Longstanding Focus on the Border and § 1226(a)'s Broad Application to the Interior.**

The history of immigration detention illustrates just what a "radical [and] fundamental change" Respondents seek to enact. *MCI Telecomms. Corp. v. Am. Tel.*

6

*& Tel. Co.*, 512 U.S. 218, 229 (1994). For nearly 150 years, 8 U.S.C. § 1225(b)(2)(A) and its predecessors have been rooted, in text and in practice, in processing those seeking lawful entry at the border. IIRIRA did not repudiate that historic focus—it retained it, as reflected in § 1225(b)(2)(A)'s "seeking admission" proviso. And IIRIRA simultaneously reworded the interior-detention-with-bond authority to ensure that people who had entered without inspection remained within *that* statute's scope.

   **1.**   The federal government first began inspecting and excluding immigrants arriving at the borders in the late 1800s.[3] Detentions followed: In 1875, Congress authorized brief detentions aboard arriving passenger ships.[4] In 1882, it prohibited Chinese arrivals from disembarking until a customs official examined them and reviewed the ship's manifest.[5] And in 1891, Congress authorized removal of arriving persons from their vessels for detention on land "until a thorough inspection is made," provided that they were "properly housed, fed, and cared for."[6]

---

[3] DANIEL WILSHER, IMMIGRATION DETENTION: LAW, HISTORY, POLITICS 9-11 (2012); Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 HARV. L. REV. 1186, 1217 (2025); Paulina Arnold, *How Immigration Detention Became Exceptional*, 75 STANFORD L. REV. 261, 286-87 (2023).
[4] Page Act, Pub. L. No. 43-141, 18 Stat. 477, 477-78.
[5] Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58, 60-61.
[6] Immigration Act of 1891, Pub. L. No. 51-551, § 8, 26 Stat. 1084, 1085; Das, *supra*, at 1218-20.

These authorities evolved into what is now 8 U.S.C. § 1225(b)(2)(A). In the Immigration Act of 1893, Congress wrote, "it shall be the duty of every inspector of arriving alien immigrants to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to admission,"[7] paralleling the "clearly and beyond a doubt entitled to be admitted" language in § 1225(b)(2)(A) today. And by the Immigration Act of 1903, Congress added the "shall be detained" language in modern-day § 1225(b)(2)(A) and retained this provision's focus on noncitizens who had not effected an entry into the United States: "Every alien who may not appear to the examining immigrant inspector at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for examination in relation thereto by a board of special inquiry."[8]

In the ensuing decades, detention at the border ebbed and flowed due to statutory amendments, shifting policies governing the exercise of discretion, and varying immigration parole practices.[9] In parallel, Congress authorized detention in the interior during deportation proceedings, culminating in what is now 8 U.S.C.

---

[7] Section 5, 27 Stat. 569, 570; Wilsher, *supra*, at 15.
[8] Pub. L. No. 57-162, 32 Stat. 1213, 1220; *Texas*, 597 U.S. at 804.
[9] *See* Mary Holper, *From Border-Based to Status-Based Mandatory Immigration Detention*, 53 FORDHAM URB. L.J. (forthcoming 2026) (manuscript at 5-9); Phil Torrey, *Rethinking Immigration's Mandatory Detention Regime*, 48 U. MICH. J. L. REFORM 879, 885-86 (2015); Wilsher, *supra*, at 17-18.

Appellate Case: 25-3248     Page: 16     Date Filed: 01/26/2026 Entry ID: 5600860

§ 1226(a).[10] However, for noncitizens who had already effected an entry, Congress authorized release on bond.[11]

For instance, before IIRIRA, the relevant interior-detention statute afforded the possibility of bond "[p]ending a determination of deportability." 8 U.S.C. § 1252(a)(1) (1996). Prior to IIRIRA, noncitizens apprehended in the interior, including those who had entered without inspection, were subject to "determination[s] of deportability," *id.*—so they were undisputedly "entitled to request release on bond." Opening Brief (hereinafter "OB") at 5. So-called "*mandatory*" immigration detention (which required the government to take custody of the person and permitted release only under more limited circumstances through the parole process) remained rooted at the border; thus, from 1891 to now, § 1225(b)(2)(A) and its predecessors have been limited to, *e.g.*, "port[s] of arrival," "alien[s] seeking entry," or (today) "alien[s] seeking admission."[12]

---

[10] *See* Holper, *supra*, at 8; Das, *supra,* at 1225.

[11] *See* Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. (forthcoming 2026) (manuscript at 50-68); Denise Gilman, *Immigration Detention Expansion by Stealth*, 26 NEV. L.J. 163, 169 (2025).

[12] *See* INA of 1952, § 235, 66 Stat. 199 ("Every alien . . . who may not appear to the examining immigration officer *at the port of arrival* to be clearly and beyond a doubt entitled to land shall be detained . . . ." (emphasis added)); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 414, 110 Stat. 1271 ("[I]f the examining immigration officer determines that an alien *seeking entry* is not clearly and beyond a doubt entitled to enter, the alien shall be detained . . . ." (emphasis added)); IIRIRA § 302(a), 110 Stat. at 3009-582 ("[I[f the examining immigration officer determines that an alien *seeking admission* is not clearly and

Appellate Case: 25-3248     Page: 17     Date Filed: 01/26/2026 Entry ID: 5600860

Indeed, prior to 1988, Congress had never authorized broad, mandatory, no-bond detention of noncitizens already within the United States. Congress did so, before a final order of removal, only in the context of *crime-based* or *terrorism-based* grounds. These authorities are of recent vintage and undisputedly do not apply to Petitioner.[13]

**2.** Despite the history and tradition limiting non-criminal, no-bond detention to the border, Respondents assert that IIRIRA changed everything. But for all that IIRIRA changed, it tellingly maintained § 1225(b)(2)(A)'s focus.

One would "expect more than simple statutory silence if, and when, Congress were to intend [such] a major departure," *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017); after all, "[e]xtraordinary grants of . . . authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s],'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (quoting *Whitman v. Am. Trucking Assocs., Inc.*, 531 U.S. 457, 468 (2001)). "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or

---

beyond a doubt entitled to be admitted, the alien shall be detained . . . ." (emphasis added)).

[13] *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343, 102 Stat. 4181, 4470 (first enacting the crime-based detention statute); Holper, *supra*, at 9; Torrey, *supra*, at 893; Margaret H. Taylor, *Demore v. Kim*, *in* Immigration Stories 350 (2005).

Appellate Case: 25-3248     Page: 18     Date Filed: 01/26/2026 Entry ID: 5600860

fundamental change' to a statutory scheme," *id.* (quoting *MCI*, 512 U.S. at 229)—perhaps especially when the individual liberty interests of millions are at stake.

Here, the text Congress enacted unambiguously refutes Respondents' claim by retaining § 1225(b)(2)(A)'s link to the border. Where the statute previously stated that "an alien seeking *entry*" "shall be detained" "if the examining immigration officer determines that [they are] not clearly and beyond a doubt entitled to admission," Congress replaced "entry" with "admission" when it enacted IIRIRA. In turn, Congress defined "admission" to require a "lawful entry." 8 U.S.C. § 1101(a)(13)(A). And Congress suffused § 1225 (including, for instance, the title of § 1225(b)(2) itself) with references to "inspection" at ports of entry. Accordingly, as Petitioner explains, a person in the United States who previously entered without inspection clearly is not subject to detention under § 1225(b)(2)(A). *See* AB at 30-32.

Statutory context and structure reinforce the point. *See* AB at 22-26; 32-37. And historical materials, too, echo § 1225(b)(2)(A)'s focus on inadmissible noncitizens seeking admission, not those living in the interior. For instance, the House Judiciary Committee Report on IIRIRA described § 1225 as "regarding the inspection of aliens arriving in the U.S." H.R. Rep. No. 104-469, pt. 1, at 228 (1996) ("House Judiciary Report"). It described § 1225(b), specifically, as pertaining to "aliens arriving in the United States." *Id.* And it described (b)(2), more specifically,

11

as covering "arriving aliens" not subject to (b)(1). *Id.* at 229 (italics omitted). Similarly, the Conference Report on IIRIRA referred to § 1225 as "regarding the inspection of aliens arriving in the U.S." and § 1225(b) as involving "aliens arriving in the United States." H.R. Rep. No. 104-828, at 208, 209 (1996) (Conf. Rep.).

All in all, nary a whisper supports the claim that Congress, after a century of border-based mandatory detention, abruptly changed course to subject millions more to detention without bond under § 1225(b)(2)(A)—rendering it all the less plausible that Congress shoved that "veritable legislative zoo" into this mousehole. *Patel v. Garland*, 596 U.S. 328, 365 (2022) (Gorsuch, J., dissenting); *see, e.g.*, *Whitman*, 531 U.S. at 468; *Czyzewski*, 580 U.S. at 465.

**3.** IIRIRA also reworded the *interior*-detention-*with*-bond provisions of the INA, now codified in § 1226(a), to make clear that noncitizens in the interior who had entered without inspection remained within *that* statute's scope, and therefore are eligible for release on bond.

As noted above, prior to IIRIRA, the INA authorized detention with the possibility of bond for noncitizens in the interior "[p]ending a determination of deportability." 8 U.S.C. § 1252(a)(1) (1996). But as explained below, IIRIRA provided that noncitizens in the interior who initially entered without inspection would now be subject to *inadmissibility* grounds, leaving only those who lost status after admission subject to deportability grounds. *See infra* pp. 20-22. So, Congress

12

simultaneously reworded the INA's interior-detention provision so that noncitizens in the interior who entered without inspection, not just those who overstayed or committed a deportable offense after admission, would generally remain eligible for detention with possible release on bond. Specifically, IIRIRA removed the "deportability" limitation: It changed the phrase "[p]ending a determination of deportability," 8 U.S.C. § 1252(a)(1) (1996), to "pending a decision on whether the alien is to be removed," § 1226(a).

The effect of these changes was that § 1226(a) "restate[d]" (*i.e.*, retained) "current provisions" regarding "release on bond" of *all* noncitizens in the interior, including those who entered without inspection. House Judiciary Report at 229. This congressional choice aligned with longstanding precedent holding that people who have effected an "entry" into the United States—lawfully or not—are "entitle[d] . . . to due process of law in the context of removal proceedings." *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025); *accord, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903).[14] That Congress affirmatively

---

[14] Given these precedents, Respondents fundamentally err in asserting that their interpretation aligns with the constitutional "entry fiction." OB at 41. Under that doctrine, those standing at the very border of the nation with no ties to the United States are entitled to fewer due process protections in removal proceedings. But a noncitizen who has effected an entry—lawfully or not—remains entitled to due process. *See, e.g.*, *A.A.R.P.*, 605 U.S. at 94. On this point, Respondents get *Yamataya* backwards, *see* OB at 41; the Supreme Court has long read *Yamataya* to mean that a noncitizen who had been in the country for roughly three days *was* entitled to due

Appellate Case: 25-3248      Page: 21      Date Filed: 01/26/2026 Entry ID: 5600860

acted to ensure that noncitizens who entered without inspection remained within the discretionary-detention-with-bond authority of § 1226(a) further disproves Respondents' claim that it simultaneously subjected these individuals to the mandatory-detention-without-bond authority of § 1225(b)(2)(A).

## II. Respondents' Simplistic Account of IIRIRA's Purpose Conflicts with the Enacted Text and the Full Legislative Record.

Respondents anchor their argument not in text, but in purpose. Their briefing begins and concludes not by discussing the "seeking admission" proviso, but by emphasizing that IIRIRA was enacted with the specific objective of ending "the preferential treatment of aliens who evade inspection and enter the United States unlawfully." OB at 1; *accord id.* at 6-7, 39-41. As evidence, they repeatedly cite the same two sentences from one installment of an approximately 600-page committee report. *See id.*

This is not how statutory interpretation works. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (criticizing selective use of legislative history as akin to "looking over a crowd and picking out your friends").

---

process protections, *see, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (citing *Yamataya*, 189 U.S. at 100-01). Nor does *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), support Respondents' position. *See* OB at 41. *Thuraissigiam* considered only the Due Process Clause's application to removal proceedings—not detention. *See* 591 U.S. at 127 n.21. And even as to the removal context, *Thuraissigiam*'s due process analysis concerned a noncitizen "at the threshold of initial entry," as distinguished from a noncitizen in the interior. *Id.* at 107.

Begin, instead, with the text: Where IIRIRA did expand mandatory detention, the enacted text reflects that Congress took pains to ensure that the INS could implement the mandate—yet IIRIRA was silent as to the purported expansion Respondents assert here, which would have been an order of magnitude more onerous to operationalize. Unsurprisingly, then, the legislative record as a whole tells a more nuanced story: Although Congress in 1996 was acutely concerned with securing the border, it addressed those concerns not by exploding mandatory detention authority for people within the United States through a radical expansion of § 1225(b)(2)(A), but by enhancing border security infrastructure and abrogating parts of the statutory "entry doctrine" without erasing it completely.

1.      IIRIRA's actual expansion of detention for people apprehended within the United States (and who had not already been ordered removed) pertained specifically to crime-based detention. And IIRIRA's enacted text demonstrated acute concern for the feasibility of this expansion, which Congress estimated to affect tens of thousands of noncitizens a year—while remaining silent on the far broader expansion Respondents claim here, which (per Congress's estimates) immediately would have affected over two million noncitizens.

15

Months before IIRIRA, Congress "dramatically expanded the detention mandates for criminal aliens."[15] In IIRIRA, Congress expanded them further still.[16] It required detention without bond of any noncitizen who was inadmissible on criminal grounds, deportable due to a lengthy list of criminal grounds, or inadmissible or deportable due to terrorist activity—and expanded the underlying criminal grounds as well. *E.g.*, IIRIRA §§ 303(a), 321, 110 Stat. at 3009-585, 3009-627 to 3009-628 (codified at 8 U.S.C. §§ 1101(a)(43), 1226(c)); *see INS v. St. Cyr*, 533 U.S. 289, 295 n.4 (2001).

At the time, Congress estimated that there were roughly 100,000 "criminal aliens incarcerated in Federal and State prisons" in total, and approximately 45,000 "criminal aliens . . . placed in deportation proceedings each year." House Judiciary Report at 118, 120. Congress also knew that the INS's total detention capacity was roughly 8,500 beds, which (given a purported average detention length of 28 days) could hold about 100,000 noncitizens a year. *Id*. at 123. IIRIRA directed the INS to expand capacity modestly, from 8,500 beds to at least 9,000, by the end of fiscal year 1997. IIRIRA § 386(a), 110 Stat. at 3009-653.

---

[15] Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issues*, 74 INTERPRETER RELEASES 209, 216 (1997) (citing Antiterrorism and Effective Death Penalty Act of 1996, § 440, 110 Stat. 1214, 1276-79).
[16] *Id.*

Appellate Case: 25-3248      Page: 24      Date Filed: 01/26/2026 Entry ID: 5600860

The mismatch was clear: By Congress's estimates, its expansion of crime-based mandatory detention could tie up most, if not all, of INS's detention capacity. So IIRIRA "recognize[d] that the INS presently d[id] not have the capacity to detain all of the criminal aliens encompassed by" § 1226(c)(1).[17] Specifically, IIRIRA's enacted text contained a transitional provision with an escape hatch: "If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies [Congress] in writing … that there is insufficient detention space and [INS] personnel to carry out" revised § 1226(c), certain noncitizens subject to crime-based detention could be released for up to two years. IIRIRA § 303(b), 110 Stat. at 3009-586 to 3009-587. The government immediately triggered this escape hatch,[18] ultimately deferring full implementation of expanded § 1226(c) for two years.[19]

Tellingly, IIRIRA contained no similar provision for § 1225(b)(2)(A)—even though Congress estimated that over four million undocumented immigrants resided

---

[17] *Id.*

[18] *Id.* at 216-17.

[19] In addition to expanding crime-based detention, IIRIRA enacted a new, 90-day detention mandate specifically for people who had been ordered removed. *See* IIRIRA § 305, 110 Stat. at 3009-598 (codified at 8 U.S.C. § 1231(a)(2)). Members of Congress were acutely aware of capacity concerns regarding this mandate, too. Rep. Lamar Smith, Chairman of the House Subcommittee on Immigration and Claims, explained that "[o]ne reason to provide th[e] transition period" for IIRIRA's expansion of crime-based detention "is to accommodate the other detention mandate in title III of the IIRIRA, which calls for the detention of all aliens (not only criminals) who had been ordered removed." Lamar Smith & Edward R. Grant, *Immigration Reform: Seeking the Right Reasons*, 28 St. Mary's L.J. 883, 934 (1997).

Appellate Case: 25-3248     Page: 25     Date Filed: 01/26/2026 Entry ID: 5600860

within the country, roughly half of whom (over two million) had entered without inspection. House Judiciary Report at 111, 119. Congress understood, in other words, that the number of people in the interior who had entered without inspection outstripped INS's detention capacity by a factor of at least twenty to one. It would be "entirely inexplicable" if IIRIRA was so sensitive to the logistical challenge of revised § 1226(c)'s no-bond mandate involving tens of thousands of people a year, yet remained silent on a two-million-plus-person no-bond mandate that would be an order of magnitude more difficult to operationalize. *Reno v. AADC*, 525 U.S. 471, 483 (1999) (relying on similar transitional provision to interpret IIRIRA).

Respondents cannot explain this discrepancy. Elsewhere, they have argued that § 1225(b)(2)(A) preserves enforcement discretion, whereas § 1226(c) does not. *See, e.g.*, Reply Brief of Appellants at 24, *Lopez-Campos v. Raycraft*, No. 25-1965 (6th Cir. Jan. 15, 2026). That is incorrect: The government *always* has "enforcement discretion over arrests and prosecutions," as well as "whether to remove a noncitizen from the United States." *United States v. Texas*, 599 U.S. 670, 678-79 (2023); *accord, e.g.*, *Castle Rock v. Gonzales*, 545 U.S. 748, 760-61 (2005). Nothing in § 1226(c) displaces that discretion—yet Congress still determined that a deferred implementation framework was necessary.

Moreover, by the enacting Congress's estimates above, § 1226(c) applied to a population roughly 2-5% of the size of that affected by Respondents' reading of

18

§ 1225(b)(2)(A). Accordingly, even if Congress anticipated substantial discretion in the context of § 1225(b)(2)(A), it remains inexplicable that it would craft a detailed implementation framework for § 1226(c) while saying nothing about a two-million-plus-person mandate in § 1225(b)(2)(A).

2. Respondents' purposive argument not only ignores the enacted text—it also flouts the Supreme Court's frequent admonition that "[f]ew pieces of legislation pursue any single purpose at all costs." *Martin v. United States*, 605 U.S. 395, 408 (2025) (cleaned up). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987).

Relevant here, Congress was indeed concerned that "hundreds of thousands" of noncitizens were crossing without authorization annually. *E.g.*, House Judiciary Report at 106-07. At the same time, Congress was fully aware that—in the words of then-Associate Director of the General Accounting Office—real-world restrictions on detention capacity "support[ed] the need to stop illegal entry of aliens" at the border itself, through means other than detention. *Management Practices of the INS: Hearing Before the Subcomm. on Imm. & Claims of the H. Comm. on the Judiciary*, 104th Cong. 11 (Feb. 8, 1995). To that end, Congress made several reforms in

19

IIRIRA to secure the border and reduce incentives to cross unlawfully—but it stopped short of an infeasible no-bond detention mandate for millions of people who had laid down roots in the country.

For instance, IIRIRA codified the authority to return a land-arriving noncitizen to a contiguous territory pending proceedings, *see* IIRIRA § 302, 110 Stat. at 3009-583 (codified at 8 U.S.C. § 1225(b)(2)(C)), and directed an array of enhancements to border security, *see* IIRIRA §§ 101-12, 110 Stat. 3009-553 to 3009-559. Congress also enacted an "expedited removal" process, under which noncitizens who satisfied discrete statutory constraints could be removed under streamlined procedures—but it prohibited the government from utilizing this process against any individual who could establish at least two years of continuous presence (lawful or not). *See* IIRIRA § 302, 110 Stat. at 3009-580 to 3009-582 (codified at 8 U.S.C. § 1225(b)(1)).

In addition, where IIRIRA's border-control efforts affected people in the interior, Congress often legislated with more of a scalpel than a sledgehammer. For example, IIRIRA imposed lengthy bars on the admission of people who had previously been deported after residing in the interior without lawful status. IIRIRA § 301(b)(1), 110 Stat. at 3009-576 to 3009-577 (codified at 8 U.S.C. § 1182(a)(9)(B)). But rather than imposing these bars categorically, Congress

20

exempted certain vulnerable groups from them. *Id.*; *see* House Judiciary Report at 528 & n.11 (discussing debates that led to these exemptions).

Meanwhile, the snippet of legislative history Respondents cite pertains to the statutory "entry doctrine," under which individuals in the interior who had entered without authorization (on the one hand) and those who lapsed or lost status after a lawful admission (on the other) had been subject to the same deportability grounds. *See* OB at 6 (citing House Judiciary Report at 225). Specifically, Respondents cherry-pick a House committee's concern about "illegal aliens who have entered without inspection gain[ing] equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection." House Judiciary Report at 225. Respondents seize on this language to argue that Congress wanted to treat individuals who had entered without inspection exactly the same as brand new arrivals in *all* respects. *See* OB at 1, 6-7, 39-41.

But Respondents' selective quote not only disserves the rest of the legislative record—it omits the beginning of that very sentence: "This subsection is intended to replace *certain aspects* of the current 'entry doctrine,'" not eliminate it wholesale. House Judiciary Report at 225 (emphasis added). To be precise, the "equities and privileges" Congress "replace[d]" involved not detention, but removal grounds and procedures "in immigration proceedings." *Id.*

Prior to IIRIRA, those who entered without inspection and were later apprehended in the interior were subject to *deportability* proceedings. *See id.* at 226. Those who presented at a port of entry, in contrast, were subject to truncated *exclusion* proceedings.[20] The latter group faced several procedural disadvantages as compared to those in deportability proceedings. *E.g.*, *Landon v. Plasencia*, 459 U.S. 21, 26-27 (1982). For instance, whereas a noncitizen in excludability proceedings generally bore the burden of proving non-excludability, the government bore the burden of proof in deportability proceedings. *See id.* at 35.

To address this, IIRIRA replaced the prior statutory definition of "entry" with a definition of "admitted," *see* 8 U.S.C. § 1101(a)(13)(A), and specified that two categories of noncitizens—those "present in the United States who ha[d] not been admitted" and those "who arrive[d] in the United States" anew—would both be subject to grounds of inadmissibility. 8 U.S.C. § 1225(a)(1). And IIRIRA combined deportability and exclusion proceedings into a unified removal proceeding. *See* IIRIRA § 304, 110 Stat. 3009-587 to 3009-593. The House Judiciary Committee explained: "Under the new 'admission' doctrine, . . . aliens [who entered without inspection] will not considered to have been admitted, and thus, must be subject to a ground of inadmissibility, rather than a ground of deportation, based on their

---

[20] *See* Nadine K. Wettstein, *The 1996 Immigration Act: New Removal Proceedings, Cancellation of Removal*, *and Voluntary Departure*, 73 Interpreter Releases 1677, 1678 (1996).

Appellate Case: 25-3248     Page: 30     Date Filed: 01/26/2026 Entry ID: 5600860

presence without admission. (Deportation grounds will be reserved for aliens who have been admitted to the United States.)" House Judiciary Report at 226.

Thus, IIRIRA "modif[ied] the 'entry doctrine'" so that a noncitizen who was not lawfully admitted would face inadmissibility grounds and "would have the burden" in a removal hearing, H.R. Rep. No. 104-879 (1997), at 107-08. Contrary to Respondents' contention that Congress used oblique phrasing to explode no-bond detention, IIRIRA expressly reworded the interior-detention-with-bond authority to make clear that it still encompassed *both* people who entered without admission *and* those who lost status post-admission—mirroring the longstanding structure of due process law. *See supra* pp. 12-14. Respondents therefore substantially overstep in proclaiming that "the immigration laws no longer distinguish between aliens based on whether they manage to . . . enter the country without permission." OB at 7.

In sum, Respondents' policy arguments are wrong: IIRIRA did not enact such a massive interior-detention mandate. Instead, where IIRIRA did expand mandatory detention—to a significant but far more modest degree—it included implementation provisions that are absent here. And although IIRIRA modified the statutory "entry doctrine" as it pertained to removal grounds and procedures, it stopped well short of creating a no-bond detention mandate for millions in the interior. Thus, properly understood, only Petitioner interprets IIRIRA "as a symmetrical and coherent

regulatory scheme." *Mellouli v. Lynch*, 575 U.S. 798, 809 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

### III. Three Decades of Executive Practice and Legislative Amendments Confirm Petitioner's Interpretation.

If any doubt remained, events following IIRIRA's enactment would eliminate it. For nearly 29 years, the government consistently understood § 1225(b)(2)(A) to mean what it says. Congress repeatedly amended the INA without questioning that practice. And Congress's most recent amendments to the INA only confirm it.

**1.** "[T]he novelty of [the government's] interpretation bears mention." *Texas*, 597 U.S. at 805. "Since IIRIRA's enactment [29] years ago, every Presidential administration" has interpreted § 1225(b)(2)(A) to apply only to people seeking admission, not those who had entered the United States. *Id.* (interpreting § 1225(b)(2)(C)).

Roughly five months after IIRIRA's passage, INS and the Executive Office for Immigration Review ("EOIR") issued an interim rule to begin implementation. The agencies explained that noncitizens "who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination"; thus, "inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal

24

Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997); *see* 8 C.F.R. § 1.2.

The government adhered to that practice consistently for three decades—not just under President Clinton but also under Presidents Bush, Obama, Trump, and Biden. For instance, in 2014, the government explained that "[t]he ordinary meaning of ['seeking admission'] does not include aliens who . . . have already gained entry to the United States and continuously resided here." Reply Brief of Cross-Appellants/Appellees at 17-18, *Crane v. Johnson*, No. 14-10049 (5th Cir. Sept. 29, 2014). And Solicitors General under Presidents Obama and Trump told the Supreme Court—while arguing *against* bond hearings for many—that only § 1226(a), not § 1225(b)(2)(A), applied to those living in the interior. *See* Transcript of Oral Argument at 7-8, *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204) (Nov. 30, 2016); Transcript of Oral Argument at 12, *Rodriguez*, 583 U.S. 281 (Oct. 3, 2017) (on reargument); Supplemental Brief of the Petitioners at 4, *Rodriguez*, 583 U.S. 281 ("In virtually all cases, Section 1225(b) is applied to aliens seeking initial entry. . . . In unusual circumstances, Section 1225(b) can also apply to lawful permanent residents (LPRs) returning from abroad.").

This Court "must exercise [its] independent judgment in deciding whether [DHS] has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). But the "judgment of the Executive Branch" across the

decades "inform[s] that inquiry." *Id.* at 413. Here, that judgment underscores that Respondents' "claim[] to discover in a long-extant statute an unheralded power" must be greeted with "skepticism." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Respondents cannot explain how such a consequential detention mandate, purportedly found in "crystal clear" text, OB at 32, nonetheless eluded the Clinton, Bush, Obama, Trump, and Biden Administrations for three decades.

    **2.** Skepticism is particularly warranted because "[C]ongress has revisited the [INA] and left" this "longstanding administrative construction . . . untouched." *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974); *see Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) (teaching that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' [courts] generally [presume] the new provision should be understood to work in harmony with what has come before").

    Within roughly a decade following IIRIRA, Congress authorized immigration relief for qualified nationals of several countries, *e.g.*, Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997); broadened terrorism-based grounds for removal and detention, USA PATRIOT Act of 2001, Pub. L. No. 107-56, §§ 411-12, 115 Stat. 272, 345-52; reorganized immigration agencies, Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; modified asylum procedures, bolstered border security, expanded removal grounds, restricted review, revised work visa rules, *see* REAL ID Act of

26

2005, Pub. L. No. 109-13, div. B, 119 Stat. 302; and altered the detention framework for immigrant children, *see* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, §235, 122 Stat. 5044, 5074-82. None of these enactments—and no subsequent ones—called into question the settled meaning of § 1225(b)(2)(A).

**3.**     Congress's most recent amendments offer one last strike against Respondents. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA*, 529 U.S. at 133. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

"[T]hat is what we have here." *Id.* In January 2025, Congress enacted—and President Trump signed into law—the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3. Relevant here, the Act added subsection (1)(E) to § 1226(c), the crime-based detention statute. *See* 139 Stat. 3. The new § 1226(c)(1)(E) requires mandatory no-bond detention of any noncitizen who "is inadmissible under" certain enumerated grounds and is charged with, arrested for, convicted of, or admits having committed, specified offenses. *Id*. But if Respondents' reading of § 1225(b)(2)(A) were correct, this amendment (along with multiple other portions of § 1226(c)(1), *see* AB at 32-

27

34) would be fruitless: Those whose detention was mandated under it would already be subject to mandatory, no-bond detention as "applicant[s] for admission."

Respondents' attempts to avoid this problem fail. *See* AB at 24-26. For instance, Respondents argue that § 1226(c) bars noncitizens detained under § 1225(b)(2)(A) from being released on parole. *See* OB at 36-37, 39. But § 1226(c) "is simply a limit on the authority conferred by [§ 1226(a)]," not a freestanding prohibition; anyone described in § 1226(c) "will have been arrested by authority that springs from subsection (a)." *Nielsen v. Preap*, 586 U.S. 392, 409 (2019); *accord Rodriguez*, 583 U.S. at 288-89, 303 (describing § 1226(c) as a "carve[] out" from § 1226(a)'s "default rule"). Parole is subject to its own exceptions, which do not reference § 1226(c). *See* § 1182(d)(5)(A); *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied . . . .").

Thus, the Act's amendments to § 1226(c) affect otherwise bond-eligible individuals detained under § 1226(a)—not, as Respondents claim, parole-eligible individuals detained under § 1225(b)(2)(A). The Act also modified the immigration parole statute—not to add new exceptions, but to authorize suit over violations of existing limits. *See* 139 Stat. 4-5 (codified at 8 U.S.C. § 1182(d)(5)(C)). Respondents offer no account for why Congress would have amended the parole statute directly

28

while obliquely placing significant restrictions in a *different* statute without referencing immigration parole.

Ultimately, Respondents are forced to construe the Laken Riley Act as an ancillary, belt-and-suspenders enactment with hypothetical effect, far removed from the meaningful detention expansion its sponsors envisioned and its text directs. The Act thus underscores the implausibility of Respondents' claim to latent, decades-old authority to detain, without bond, everyone subject to it—and many millions more.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm.

Dated: January 20, 2026

Respectfully submitted,

*s/ Amit Jain*

Amit Jain
Kathleen Pleiss
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
501 H Street NW, Suite 275
Washington, DC 20002
(202) 869-3434
amit.jain@macarthurjustice.org

*Counsel for Amici Curiae*

29

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Times New Roman 14-point font.

Pursuant to 8th Cir. R. 25, I certify that the foregoing brief has been scanned for viruses and is virus free.

Dated: January 20, 2026     Respectfully submitted,

               *s/ Amit Jain*
               Amit Jain

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I further certify that participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: January 20, 2026                                 Respectfully submitted,

                                                                        *s/ Amit Jain*
                                                                        Amit Jain