# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

JOAQUIN HERRERA AVILA,

*Petitioner-Appellee*,

v.

TODD BLANCHE, U.S. ATTORNEY GENERAL, ET AL.,

*Respondents-Appellants*,

On Appeal from the United States District Court
for the District of Minnesota, No. 25-cv-3741 (Tunheim, J.)

## BRIEF FOR *AMICI CURIAE* IMMIGRATION LAW SCHOLARS IN SUPPORT OF PETITIONER-APPELLEE'S PETITION FOR REHEARING EN BANC

Amit Jain
Kathleen Pleiss
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3434
amit.jain@macarthurjustice.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF *AMICI CURIAE* ...........................................................................1

INTRODUCTION ....................................................................................................1

ARGUMENT ............................................................................................................2

I.      Rehearing En Banc Is Warranted. ..................................................................2

      A.      The Panel Erred in Overlooking § 1225(b)(2)(A)'s History. ...............2

      B.      The Panel Erred in Its Analysis of Congress's Purpose in 1996. .........5

      C.      The Panel Erred in Its Analysis of Events After 1996. ........................11

CONCLUSION .......................................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Alvarez v. Warden, Fed. Det. Ctr. Miami,*
  No. 25-14065, 2026 WL 1243395 (11th Cir. May 6, 2026) ..................1, 6, 9, 10

*Avila v. Bondi,*
  170 F.4th 1128 (8th Cir. 2026) ..................................................*passim*

*Barco Mercado v. Francis,*
  No. 25-cv-6582, 2025 WL 3295903 (S.D.N.Y. Nov. 26, 2025) .........................5

*Biden v. Texas,*
  597 U.S. 785 (2022)..............................................................5, 11

*Cunha v. Freden,*
  175 F.4th 61 (2d Cir. 2026) .........................................................1

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
  545 U.S. 546 (2005)..................................................................7

*INS v. St. Cyr,*
  533 U.S. 289 (2001)..................................................................8

*Lopez-Campos v. Raycraft,*
  No. 25-1965, 2026 WL 1283891 (6th Cir. May 11, 2026) ...........................1, 11

*Martin v. United States,*
  605 U.S. 395 (2025)..................................................................6

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
  595 U.S. 109 (2022) (per curiam).....................................................5

*Nielsen v. Preap,*
  586 U.S. 392 (2019).................................................................12

*Reno v. AADC,*
  525 U.S. 471 (1999)..................................................................9

*Utility Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014).................................................................11

**Statutes**

8 U.S.C. § 1101(a)(43)..................................................................................8

8 U.S.C. § 1182(d)(5)(A) ............................................................................12

8 U.S.C. § 1225(b)(2)(A) ......................................................................*passim*

8 U.S.C. § 1226(a) ....................................................................7, 10, 11, 12

8 U.S.C. § 1226(c) ................................................................................8, 12

8 U.S.C. § 1226(c)(1)(E).........................................................................11, 12

8 U.S.C. § 1252(a)(1) (1996) .......................................................................10

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343,
102 Stat. 4181 ....................................................................................4

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No.
104-132, § 414, 110 Stat. 1214 ...............................................................4

Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58 (1882)..............................3

Illegal Immigration Reform and Immigrant Responsibility Act of
1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 ...................1

IIRIRA, Pub. L. No. 104-208, div. C, § 302(a) .................................................4

IIRIRA, Pub. L. No. 104-208, div. C, § 303(a) .................................................8

IIRIRA, Pub. L. No. 104-208, div. C, § 303(b).................................................9

IIRIRA, Pub. L. No. 104-208, div. C, § 321.....................................................8

Immigration Act of 1891, Pub. L. No. 51-551, § 8, 26 Stat. 1084 ...........................3

Immigration Act of 1893, § 5, 27 Stat. 569 .....................................................3

Immigration Act of 1903, Pub. L. No. 57-162, 32 Stat. 1213 .................................3

Immigration and Nationality Act of 1952, § 235, 66 Stat. 199 ...............................4

Laken Riley Act of 2025, Pub. L. No. 119-1, 139 Stat. 3 .....................................11

Page Act, Pub. L. No. 43-141, 18 Stat. 477 (1875) ....................................................3

**Other Authorities**

DANIEL WILSHER, IMMIGRATION DETENTION: LAW, HISTORY, POLITICS (2012) ...........................................................................................................3

Denise Gilman, *Immigration Detention Expansion by Stealth*, 26 NEV. L.J. 163 (2025) ..............................................................................4

H.R. Rep. No. 104-469 (1996)........................................................................*passim*

Kyle Cheney, *Our Running List of Judges Who Have Ruled on ICE's Mass Detention Policy*, POLITICO (Feb. 12, 2026)...................................2

Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. (forthcoming 2026) .................................................................................4

Mary Holper, *From Border-Based to Status-Based Mandatory Immigration Detention*, 53 FORDHAM URB. L.J. 711 (2026)................................7

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are scholars of immigration detention, law, and history whose expertise yields insights regarding the statutory framework. *Amici* include Paulina D. Arnold; Ahilan T. Arulanantham; Adam B. Cox; Alina Das; Ingrid Eagly; Denise L. Gilman; Bill Ong Hing; Mary Holper; Hiroshi Motomura; Lindsay Nash; Juliet Stumpf; Margaret H. Taylor; and Philip L. Torrey.

## INTRODUCTION

The panel split over an exceptionally important question: Did the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, include the broadest detention-without-bond mandate in history—one whose existence eluded five presidential administrations, the courts, and Congress for three decades? The majority, departing from at least three other circuits and over 400 district judges, said yes. *See Lopez-Campos v. Raycraft*, No. 25-1965, 2026 WL 1283891, at *13 (6th Cir. May 11, 2026); *Alvarez v. Warden, Fed. Det. Ctr. Miami*, No. 25-14065, 2026 WL 1243395, at *21 (11th Cir. May 6, 2026); *Cunha v. Freden*, 175 F.4th 61, 96 (2d Cir. 2026);

---

[1] This brief has not been authored in any part by counsel to any party in this appeal. No party, party's counsel, or person other than *amici* or their counsel contributed money intended to fund preparation or submission of this brief.

Kyle Cheney, *Our Running List of Judges Who Have Ruled on ICE's Mass Detention Policy*, POLITICO (last updated April 28, 2026).[2]

In doing so, the majority disregarded the history of 8 U.S.C. § 1225(b)(2)(A), which has focused on detention at the border—not the interior—for over a century. The majority also erred by concluding, based on an isolated snippet of legislative history, that IIRIRA pursued one "goal" at any cost, despite conflicting historical evidence and enacted text. *Avila v. Bondi*, 170 F.4th 1128, 1136 (8th Cir. 2026). And the majority got recent history wrong too, giving short shrift to decades of practice and misinterpreting last year's amendments to the detention statutes. The en banc Court should grant rehearing.

## ARGUMENT

**I.      Rehearing En Banc Is Warranted.**

**A.      The Panel Erred in Overlooking § 1225(b)(2)(A)'s History.**

For nearly 150 years, § 1225(b)(2)(A) and its predecessors have focused on detention connected to processing people seeking admission at the border. In parallel, for noncitizens apprehended in the interior, there has virtually always been

---

[2] https://www.politico.com/news/2026/02/18/trump-judges-immigration-detention-00784614?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000014c-2414-d9dd-a5ec-34bc52a40001.

the possibility of release pending removal proceedings. The panel majority hardly considered this history before upending it.

The federal government began inspecting and excluding immigrants at the borders in the late 1800s. *E.g.*, DANIEL WILSHER, IMMIGRATION DETENTION: LAW, HISTORY, POLITICS 9-11 (2012). In 1875, Congress authorized brief detentions aboard arriving passenger ships. Page Act, Pub. L. No. 43-141, 18 Stat. 477, 477-78. In 1882, it prohibited Chinese arrivals from disembarking until an official examined them. Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58, 60-61. In 1891, Congress authorized removal of persons from arriving vessels for detention on land "until a thorough inspection is made." Immigration Act, Pub. L. No. 51-551, § 8, 26 Stat. 1084, 1085.

These predecessor statutes evolved into § 1225(b)(2)(A). The Immigration Act of 1893, § 5, 27 Stat. 569, 570, provided, "it shall be the duty of every inspector of arriving alien immigrants to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to admission," paralleling the "clearly and beyond a doubt entitled to be admitted" language in § 1225(b)(2)(A) today. And the Immigration Act of 1903, Pub. L. No. 57-162, 32 Stat. 1213, 1220, contained today's "shall be detained" language: "Every alien who may not appear to the examining immigrant inspector at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for examination . . . ."

In this early period, Congress also provided for detention in the interior during deportation proceedings. But for noncitizens who had already entered and were apprehended in the interior, release pending removal proceedings was virtually always a possibility. *E.g.*, Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. (forthcoming 2026) (manuscript at 50-68); Denise Gilman, *Immigration Detention Expansion by Stealth*, 26 NEV. L.J. 163, 169 (2025). "Mandatory" detention (which required the government to take custody and permitted release only under more limited circumstances through the parole process) remained rooted at the border. *E.g.*, Immigration and Nationality Act of 1952 ("INA"), § 235, <u>66 Stat. 199</u> (limiting the relevant provision to "alien[s] . . . at the port of arrival"); Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 414, <u>110 Stat. 1214</u>, <u>1271</u> ("alien[s] seeking entry"); IIRIRA § 302(a), 110 Stat. at 3009-582 ("alien[s] seeking admission").

Congress did not authorize broad, mandatory, no-bond detention of noncitizens in the interior pending removal proceedings until 1988. Even then, Congress permitted such detention only for *crime-based* or *terrorism-based* grounds. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343, <u>102 Stat. 4181</u>, <u>4470</u>. Outside of this narrow context, there remained an "unbroken" tradition "of granting discretion to immigration authorities to release noncitizens"

apprehended in the interior "pending final removal decisions." *Barco Mercado v. Francis*, <u>811 F. Supp. 3d 487, 500</u> (S.D.N.Y. 2025).

The panel majority failed to even consider this longstanding framework. But the historical tradition dictates "a more humble role" for § 1225(b)(2)(A) than the sweeping, no-bond detention command the majority blessed. *Biden v. Texas*, <u>597 U.S. 785, 805</u> (2022). Moreover, the "lack of historical precedent" for Respondents' policy, "coupled with the breadth of authority [they] now claim[], is a 'telling indication'" that the policy "extends beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. OSHA*, <u>595 U.S. 109, 119</u> (2022) (per curiam).

**B.      The Panel Erred in Its Analysis of Congress's Purpose in 1996.**

Respondents asserted—and the majority agreed—that everything changed in 1996. They found support in what they perceived to be the "statutory purpose" of IIRIRA: "to 'ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings.'" *Avila*, <u>170 F.4th at 1135-36</u>. They discerned this overarching goal from part of one sentence in one installment of one approximately 600-page committee report. *See id.* (citing H.R. Rep. No. 104-469, pt. 1, at 225 (1996) ("Judiciary Report")).

This analysis of IIRIRA's aims was badly incomplete. Indeed, IIRIRA's text features multiple blaring indicators that the majority's purposive exploration went

astray—underscoring that "[f]ew pieces of legislation pursue any single purpose at all costs." *Martin v. United States*, 605 U.S. 395, 408 (2025) (cleaned up).

**1.** To the extent legislative history can illustrate congressional purpose, the panel majority's analysis was deficient. IIRIRA sought to unify inadmissibility *proceedings* among people who entered without inspection and people arriving at the border by subjecting them to the same grounds of inadmissibility and the same evidentiary burdens. But it reinforced the difference in *detention* schemes between the border and the interior for the duration of those proceedings, ensuring people in the interior retained the possibility of bond pending removal proceedings.

At Respondents' urging, the majority focused on a snippet of legislative history reflecting the House Judiciary Committee's concern that, under the so-called entry doctrine, "aliens who have entered . . . without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection." *Avila*, 170 F.4th at 1136 (citing Judiciary Report at 225). But the majority ignored the beginning of the sentence, which states explicitly that Congress "intended to replace *certain aspects*" of that doctrine, not abolish *all* distinctions between the two groups. Judiciary Report at 225 (emphasis added); *Alvarez*, 2026 WL 1243395, at *19.

Specifically, IIRIRA overhauled removal proceedings so that noncitizens who had entered without inspection (like those who presented at the border) would be

subject to grounds of inadmissibility and bear the burden of proof in removal hearings. *See, e.g.*, Mary Holper, *From Border-Based to Status-Based Mandatory Immigration Detention*, 53 FORDHAM URB. L.J. 711, 729-30, 758-79 (2026). IIRIRA thus equalized "certain aspects" of "immigration *proceedings*," Judiciary Report at 225 (emphasis added)—but it did not enact an indiscriminate, unfunded, and infeasible multi-million-person *detention* mandate.

The majority also overlooked other relevant statements in the same report. For example, the Committee emphasized that revised § 1226(a), the interior-detention-with-bond provision, "restate[d]" (*i.e.*, retained) "current provisions" regarding "release on bond" of *all* noncitizens in the interior, including those who entered without inspection. Judiciary Report at 229. In contrast, the Committee described § 1225(b) and § 1225(b)(2) as pertaining to "aliens arriving in the U.S." and "arriving aliens." Judiciary Report at 228-29 (italics omitted). In light of the full record, Respondents' reliance on one isolated clause, echoed by the majority, is a paradigmatic example of "looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

**2.** IIRIRA's text proves the point. For starters, the statute's actual expansion of detention for people apprehended within the United States pending removal proceedings pertained to *crime-based* detention. And the enacted text demonstrates acute concern for the feasibility of this expansion, which Congress

estimated to affect tens of thousands of noncitizens a year—while remaining silent on the breathtaking expansion the majority embraced, which (per Congress's estimates) immediately would have affected over two million.

Congress substantially broadened crime-based mandatory detention in 1996. In particular, IIRIRA required detention without bond of any noncitizen who was inadmissible or deportable based on significantly expanded criminal grounds. *E.g.*, IIRIRA §§ 303(a), 321, 110 Stat. at 3009-585, 3009-627 to 3009-628 (codified at 8 U.S.C. §§ 1101(a)(43), 1226(c)); *INS v. St. Cyr*, 533 U.S. 289, 295 n.4 (2001). Congress estimated that there were roughly 100,000 "criminal aliens incarcerated in Federal and State prisons" and approximately 45,000 "criminal aliens . . . placed in deportation proceedings each year." Judiciary Report at 118, 120. Congress also knew that the government had capacity to detain, in total, about 100,000 noncitizens a year. *Id*. at 123.

The mismatch was clear: By Congress's estimates, expanded crime-based mandatory detention could tie up most, if not all, detention beds. So, the enacted text included a transitional provision with an escape hatch: "If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies [Congress] in writing . . . that there is insufficient detention space and . . . personnel available to carry out" expanded crime-based detention, some noncitizens subject to it could be

released for up to two years. IIRIRA § 303(b), 110 Stat. at 3009-586 to 3009-587; *Alvarez*, 2026 WL 1243395, at \*19.

Tellingly, IIRIRA contained no similar provision for § 1225(b)(2)(A)—yet Congress estimated over four million undocumented immigrants resided within the country, roughly half of whom (over two million) entered without inspection. Judiciary Report at 111, 119. Congress thus understood that the number of people in the interior who entered without inspection outstripped detention capacity by a factor of at least twenty to one. It would be "entirely inexplicable" if IIRIRA was so sensitive to the challenge of a crime-based mandate involving tens of thousands of people a year, yet remained silent on a two-million-plus-person mandate. *Reno v. AADC*, 525 U.S. 471, 483 (1999).

The majority fundamentally misunderstood this point, which it dismissed as "speculation" driven by "legislative history." *Avila*, 170 F.4th at 1137-38. In fact, the transitional provision was part of the statutory text enacted by Congress and signed into law by the President. *See* IIRIRA § 303(b), 110 Stat. at 3009-586 to 3009-587. That is why, in an opinion by Justice Scalia interpreting another provision of IIRIRA, the Supreme Court relied on a similar inference from IIRIRA's transitional provisions. *See Reno*, 525 U.S. at 483. By dismissing such textual analysis as "speculation," *Avila*, 170 F.4th at 1137-38, and relying instead on cherry-

picked language from a committee report, *see id.* at 1136, the majority inverted basic principles of statutory interpretation.

3.      The majority also ignored further textual evidence that contradicted its holding. Specifically, IIRIRA reworded the *interior*-detention-*with*-bond authority, now codified at 8 U.S.C. § 1226(a), to make clear that noncitizens who entered without inspection remained within *that* statute's scope, and therefore remained eligible for bond.

Prior to IIRIRA, the INA authorized detention with the possibility of bond for noncitizens in the interior "[p]ending a determination of deportability." 8 U.S.C. § 1252(a)(1) (1996). But IIRIRA provided that noncitizens in the interior who entered without inspection would now be subject to *inadmissibility* grounds, leaving only those who lost status after admission subject to deportability grounds. *See* Judiciary Report at 226.

At the same time, however, Congress explicitly reworded the INA's interior-detention provision. *See Alvarez*, 2026 WL 1243395, at \*19. Specifically, IIRIRA removed the statute's "deportability" limitation: It changed the phrase "[p]ending a determination of deportability," 8 U.S.C. § 1252(a)(1) (1996), to "pending a decision on whether the alien is to be removed," § 1226(a); *accord* Judiciary Report at 229 (§ 1226(a) "restates the current provisions in [§ 1252(a)(1)] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not

lawfully in the United States"). Thus, IIRIRA affirmatively ensured that noncitizens who entered without inspection remained within the discretionary-detention-with-bond authority of § 1226(a)—a fact the majority overlooked when it held that they were, instead, subject to the no-bond detention authority of § 1225(b)(2)(A).

### C. The Panel Erred in Its Analysis of Events After 1996.

The majority further erred in its analysis of recent history. It dismissed the fact that from 1996 to 2025, the government consistently understood § 1225(b)(2)(A) to apply only to people seeking admission, not those who already entered. *See Avila*, 170 F.4th at 1136-37; *Lopez-Campos*, 2026 WL 1283891, at *6. That "every Presidential administration has interpreted" the provision this way "[s]ince IIRIRA's enactment [29] years ago" offers powerful evidence of its meaning. *Texas*, 597 U.S. at 805; *see Avila*, 170 F.4th at 1140 (Erickson, J., dissenting). Moreover, Respondents' "claim[] to discover in a long-extant statute an unheralded power" must be greeted with a degree of "skepticism" that is absent from the majority's analysis. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Further, the majority rendered superfluous the centerpiece of the Laken Riley Act of 2025, Pub. L. No. 119-1, 139 Stat. 3. New § 1226(c)(1)(E) requires detention without bond of any noncitizen who "is inadmissible under" certain grounds and is charged with, arrested for, convicted of, or admits committing specified offenses. And if Respondents were correct, then all those whose detention is now mandated

under § 1226(c)(1)(E) would *already* have been subject to mandatory, no-bond detention under § 1225(b)(2)(A).

Neither of the majority's responses hold water. First, the majority suggested § 1226(c)(1)(E) "eliminates the option of parole . . . for those to whom it applies." *Avila*, 170 F.4th at 1137 (quoting *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 505 (5th Cir. 2026)). That is incorrect: § 1226(c) "is simply a limit on the authority conferred by [§ 1226(a)]." *Nielsen v. Preap*, 586 U.S. 392, 409 (2019). It has no bearing on the parole authority for those detained under § 1225(b)(2)(A), which has its own independent exceptions. *See* § 1182(d)(5)(A).

Second, the majority reasoned that because the Executive Branch never previously implemented Respondents' radical new policy, the Laken Riley Act was merely an "effort to be 'doubly sure' to deny parole" to certain noncitizens. *Avila*, 170 F.4th at 1137. But had Congress considered such longstanding practice erroneous, it would have corrected it by requiring detention of *everyone* who entered without inspection—not just a *subset* accused of certain offenses. That Congress chose a far narrower path is more evidence that it never enacted the mandate the panel majority embraced.

## CONCLUSION

The Court should grant rehearing en banc.

Dated: June 2, 2026

Respectfully submitted,

*s/ Amit Jain*

Amit Jain
Kathleen Pleiss
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3434
amit.jain@macarthurjustice.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(b)(4)</u> because it contains 2,600 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Times New Roman 14-point font.

Dated: June 2, 2026

Respectfully submitted,

*s/ Amit Jain*
Amit Jain

# CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I further certify that participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: June 2, 2026                                          Respectfully submitted,

                                                             *s/ Amit Jain*
                                                             Amit Jain